IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 11-cv-23776-KMM

WENDY RUIZ, *et al.*,

      Plaintiffs,

vs.

GERARD ROBINSON, *et al.*,

      Defendants.

_____/

## ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This case is about regulations of the Florida State Board of Education and the Florida Board of Governors that classify students who are United States citizens and reside in the State of Florida as "out of state" residents because their parents, who also reside in Florida, are undocumented for federal immigration purposes. As a result of this classification, these Florida residents must pay significantly higher tuition rates to attend the State's public post-secondary educational institutions and are denied the preferential treatment that residents receive throughout the admissions process at several of these institutions. Plaintiffs and Defendants have each moved for summary judgment (ECF Nos. 75 & 89). Responses (ECF Nos. 85 & 89) and Replies (ECF Nos. 90 & 93) were filed by both Parties. As discussed further in this opinion, classifying U.S. citizen students who reside in Florida according to their parents' undocumented federal immigration status does not advance any legitimate State interest, much less the State's important interest in furthering educational opportunities for its own residents. Accordingly, Defendants' regulations must fail because they deny to each of these United States citizens the

1

equal protection of the laws as guaranteed under the Fourteenth Amendment to the United States Constitution.

## I. THE PARTIES[1]

Plaintiffs are all dependent U.S. citizens who aspire to earn post-secondary degrees from Florida public institutions of higher education. Plaintiff Wendy Ruiz was born in Miami, Florida in 1992 and is a U.S. citizen by virtue of birthright.[2] Ruiz's parents have resided continuously in Florida for the past ten years. Ruiz has resided in Florida her entire life and graduated from a Florida public high school in 2010. During her senior year in high school, Ruiz attempted to enroll at Florida International University ("FIU"). FIU requires applicants to disclose their parents' federal immigration status, and after Ruiz was unable to furnish this information, she was unable to complete the application process. Ruiz currently attends Miami-Dade College ("MDC") and because she is a dependent student who cannot prove her parents' federal immigration status, she has been classified as an "out-of-state resident," and is required to pay a tuition rate nearly three times higher than the tuition rate for Florida residents. Consequently, Ruiz has been unable to afford a full course load of classes each semester and it will take her more than two years to complete a two-year degree.

---

[1]   The facts herein are taken from Plaintiff's Motion for Summary Judgment, Defendant's Motion for Summary Judgment, and the Parties' Responses and Replies.

[2] See U.S. CONST. amend. XIV, § 1, cl. 1 ("All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside."); United States v. Wong Kim Ark, 169 U.S. 649 (1898) ("The fourteenth amendment of the constitution . . . contemplates two sources of citizenship, and two only,-birth and naturalization. Citizenship by naturalization can only be acquired by naturalization under the authority and in the forms of law. But citizenship by birth is established by the mere fact of birth under the circumstances defined in the constitution. Every person born in the United States, and subject to the jurisdiction thereof, becomes at once a citizen of the United States, and needs no naturalization."). Birthright citizenship derives from "a version of the jus soli ('citizenship by right of the soil') rule, where the alien parent's status does not matter in granting citizenship to the child." See Michelle J. Seo, Note, Uncertainty of Access:  U.S. Citizen Children of Undocumented Immigrant Parents and In-State Tuition for Higher Education, 44 COLUM. J.L. & SOC. PROBS. 311, 316 (2011).

Plaintiff Noel Saucedo was born in Miami, Florida in 1991 and is a U.S. citizen by virtue of birthright. Saucedo and his parents have resided in Florida since 2006 and Saucedo graduated from a Florida public high school in June 2010. Like Plaintiff Ruiz, Saucedo attempted to enroll at FIU but could not complete the application because he was unable to provide proof of his parents' federal immigration status. Saucedo later received a full scholarship to attend MDC's two-year program. Saucedo, however, is a dependent student who cannot prove his parents' federal immigration status, and for this reason, MDC classified Saucedo as an out-of-state resident. As a result, Saucedo is required to pay a higher tuition rate than resident students and his scholarship was reduced. Despite having initially received a full-scholarship, Saucedo is unable to afford a full course load of classes each semester and it will take him more than two years to complete a two-year degree.

Plaintiff Caroline Roa was born in Miami, Florida in 1993 and is a U.S. citizen by virtue of birthright. Roa's father—her only living parent—has resided in Florida for the past twenty-two years. Roa has resided in Florida her entire life and graduated from a Florida public high school in 2011. Roa was accepted to MDC, however, for the same reasons as Saucedo and Ruiz, Roa was classified as an out-of-state student and required to forfeit an academic scholarship that would have covered her full tuition and costs associated with attending MDC. Roa was consequently unable to attend college.

Plaintiff Kassandra Romero was born in Los Angeles, California, in 1993 and is a U.S. citizen by virtue of birthright. Romero and her parents have resided continuously in Florida since 1998 and Romero graduated from a Florida public high school in 2011. In early 2011 Romero registered to attend Palm Beach State College ("PBSC"). Shortly before classes were scheduled to begin, however, PBSC officials informed Romero that she would need to provide proof of her parents' federal immigration status to qualify for the in-state tuition rate. Romero

was unable to prove her parents' federal immigration status. Consequently, Romero was unable to afford to attend PBSC and was forced to withdraw. Romero is currently not attending a post-secondary educational institution.

Plaintiff Janeth America Perez was born in Miami, Florida in 1992 and is a U.S. citizen by virtue of birthright. Perez's mother has resided in Florida for the past twenty-five years, and Perez has resided in Florida her entire life. Upon graduating from a Florida public high school in 2011, Perez applied to MDC and was accepted. Perez, however, was classified as an out-of-state resident because she was unable to prove her parents' federal immigration status. Unable to afford MDC's higher tuition rate for out-of-state residents, Perez was forced to withdraw from MDC. Perez currently attends a Job Corps program[3] and plans on attending college in the future.

Defendant Gerard Robinson is the Florida Commissioner of Education and a member of the Florida Board of Governors. The Commissioner is the Executive Director of the Department of Education and is the chief educational officer for the State of Florida. FLA. STAT. §§ 20.15(2), 1001.10(1). The Commissioner is "responsible for giving full assistance to the State Board of Education in enforcing compliance with the mission and goals of the K-20 education system except for the State University System." FLA. STAT. § 1001.10(1). This includes the State's twenty-eight community colleges, which includes MDC and PBSC. The State Board of Education and the Board of Governors are responsible for adopting rules to determine the residency status of community college students for tuition purposes. FLA. STAT. § 1009.21(13). Robinson is sued in his official capacity.

Defendant Frank T. Brogan is Chancellor of the State University System. The Chancellor of the State University System is appointed by the Board of Governors and is tasked

---

[3] Job Corps is a program sponsored by the U.S. Department of Labor that offers technical training and education programs for students ages sixteen through twenty-four.

with aiding the Board of Governors in implementing its responsibilities. FLA. STAT. § 20.155(3). The Florida Board of Governors oversees eleven public universities in the State of Florida, including FIU, and is responsible for operating, regulating, and controlling the management of the State University System. Id. § 20.155(4). Brogan is sued in his official capacity. The remaining Defendants[4] are all Chairs or Members of the Florida State Board of Education or the Florida Board of Governors. All Defendants are sued in their official capacity.

## II. JURISDICTION AND VENUE

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the United States Constitution. This Court also has jurisdiction pursuant to 28 U.S.C. § 1343 because this action seeks to redress the deprivation "of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States." Venue is proper under 28 U.S.C. § 1391(b) because each Plaintiff lives in the Southern District of Florida and applied to public post-secondary educational institutions in the Southern District of Florida.

---

[4] The remaining Defendants are Kathleen Shanahan, Chair of the Florida State Board of Education; Roberto Martinez, Member and Vice Chair of the Florida State Board of Education; Sally Bradshaw, Member of the Florida State Board of Education; Gary Chartrand, Member of the Florida State Board of Education; A.K. Desai, Member of the Florida State Board of Education; Barbara S. Feingold, Member of the Florida State Board of Education; John R. Padget, Member of the Florida State Board of Education; Dean Colson, Chair of the Florida Board of Governors; Morteza "Mori" Hosseini, Vice Chair of the Florida Board of Governors; Richard A. Beard, III, Member of the Florida Board of Governors; Joseph L. Caruncho, Member of the Florida Board of Governors; Chris Corr, Member of the Florida Board of Governors; Patricia Frost, Member of the Florida Board of Governors; Thomas G. Kuntz, Member of the Florida Board of Governors; Michael Long, Member of the Florida Board of Governors and Chair of the Florida Student Association; Ava L. Parker, Member of the Florida Board of Governors; Tico Perez, Member of the Florida Board of Governors; John Rood, Member of the Florida Board of Governors; Gus A. Stavros, Member of the Florida Board of Governors; John W. Temple, Member of the Florida Board of Governors; Norman D. Tripp, Member of the Florida Board of Governors; and Richard A. Yost, Member of the Florida Board of Governors.

## III. BACKGROUND

Individuals are classified under Florida law as residents and non-residents in order to determine tuition rates for public colleges and universities. See FLA. STAT. § 1009.21. A student who qualifies as a resident is also afforded preferential treatment throughout the admissions process by several of Florida's post-secondary educational institutions. Pl.'s Resp., at 3. The definition of a "legal resident" or "resident" is "a person who has maintained his or her residence in this state for the preceding year, has purchased a home which is occupied by him or her as his or her residence, or has established a domicile in this state . . . ." Id. § 1009.21(1)(d). The statute further distinguishes between individuals who are independent and those that are dependent in establishing in-state residency. A "dependent" is "any person, whether or not living with his or her parent, who is eligible to be claimed by his or her parent as a dependent under the federal income tax code." Id. § 1009.21(1)(a). To establish residency for tuition purposes, "[a] person or, if that person is a dependent child, his or her parent or parents must have established legal residence in this state and must have maintained legal residence in this state for at least 12 consecutive months immediately prior to his or her initial enrollment in an institution of higher education." Id. § 1009.21(2)(a)1.

Pursuant to section 1009.21, the State Board of Education and the Board of Governors are authorized to adopt additional regulations in order to implement the statute. Id. § 1009.21(13). Both the State Board of Education and the Board of Governors have adopted additional criteria in determining residency for tuition and other purposes. See FLA. ADMIN. CODE r. 6A-10.044; FLA. ADMIN. CODE r. 72-1.001. Both regulations provide, *inter alia*, additional criteria in determining residency when an individual or the parents of a dependent are not citizens of the United States. For example, "[t]he student, and parent if the student is a

6

dependent, must present evidence of legal presence in the United States." FLA. ADMIN. CODE r. 72-1.001(5)(a)3; see also FLA. ADMIN. CODE r. 6A-10.044(4).

In light of these regulations, Plaintiffs allege that they have been wrongfully classified as "non-residents" of the State of Florida and, *inter alia*, charged higher tuition rates than individuals who qualify as residents. Plaintiffs allege this classification is the sole result of their inability to establish their parents' lawful immigration status and claim that this classification violates their rights under the Equal Protection Clause of the Fourteenth Amendment and the Supremacy Clause of the United States Constitution.

## IV. LEGAL STANDARD

Summary judgment may be entered only where there is no genuine issue of material fact. Twiss v. Kury, 25 F.3d 1551, 1554 (11th Cir. 1994). The moving party has the burden of meeting this exacting standard. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Moreover, "A party must support its assertion that there is no genuine issue of material fact by 'citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials.'" Ritchey v. S. Nuclear Operating Co., No. 10-11962, 2011 WL 1490358, at *1 (11th Cir. Apr. 20, 2011) (quoting Fed. R. Civ. P. 56(c)(1)). An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Id.

In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. Id. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient;

7

there must be evidence on which the jury could reasonably find for the [nonmovant]." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).

## V. ANALYSIS

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall deny "any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. Thus the Equal Protection Clause reflects a fundamental tenant that "'all persons similarly circumstanced shall be treated alike.'" <u>Plyler v. Doe</u>, 457 U.S. 202, 217 (1982) (quoting <u>F. S. Royster Guano Co. v. Virginia</u>, 253 U.S. 412, 415 (1920)).[5] At its inception, the reach of Equal Protection Clause was interpreted narrowly by the Supreme Court. In <u>The Slaughter-House Cases</u>, the Supreme Court noted that it "doubt[ed] very much whether any action of a State not directed by way of discrimination against the negroes as a class, or on account of their race, will ever be held to come within the purview of [the Equal Protection Clause]." 83 U.S. (17 Wall.) 36, 81 (1872). This of course proved false and just over a decade later the Supreme Court relied on the Equal Protection Clause to strike down a San Francisco city ordinance that discriminated against Asians and Asian-Americans. <u>See</u> <u>Yick Wo v. Hopkins</u>, 118 U.S. 356 (1886). The Supreme Court has since expanded the reach of the Equal Protection Clause to encompass numerous types of legislative classifications in order to preserve substantive values of equality and liberty. <u>See</u> LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 1465 (2d ed. 1988).

With this expansion, the Supreme Court has recognized that some legislative classifications threaten the substantive values of equality and liberty more so than others.

---

[5] As the United States Supreme Court has noted on numerous occasions, however, the Constitution does not "require things which are different in fact or opinion to be treated in law as though they were the same." <u>Plyler</u>, 457 U.S. at 217 (quoting <u>Tigner v. Texas</u>, 310 U.S. 141, 147 (1940)).

Legislative classifications that impinge access to a fundamental right; distribute burdens of benefits inconsistent with a fundamental right; or prejudice groups based on, *inter alia*, immutable qualities, are subject to "strict scrutiny." See Kramer v. Union Free Sch. Dist. No. 15, 395 U.S. 621 (1969) (holding that a state statute that restricted voting in school district elections to those who had children enrolled in the local public school or owned or leased taxable property in the district violated the Equal Protection Clause); Shapiro v. Thompson, 394 U.S. 618, 627 (1969) (holding that denial of welfare benefits based on duration of residency "constitutes an invidious discrimination" and violates the Equal Protection Clause); Korematsu v. United States, 323 U.S. 214, 216 (1944) (holding that classifications based on race are subject to the "most rigid scrutiny"); see also TRIBE, supra, at 1464. Such legislative classifications are only permissible to promote a "compelling" state interest. See San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 97 (1973).

Legislative classifications in the context of economic and commercial matters are afforded a lower level of scrutiny and are generally reviewed to ensure that the state classification bears only a rational relationship to a legitimate state purpose. See Mass. Bd. of Retirement v. Murgia, 427 U.S. 307, 314 (1976) (upholding a Massachusetts' statute that imposed a mandatory retirement age upon police officers because the classification was rationally related to the state's legitimate interest in protecting the public by "assuring physical preparedness of its uniformed police"); see also Rodriguez, 411 U.S. at 97 (citing cases). The Supreme Court has more recently held that some legislative classifications, such as classifications based on gender or illegitimacy, are subject to an intermediate level of scrutiny that falls somewhere between strict scrutiny and rational basis. Trimble v. Gordon, 430 U.S. 762 (1977) (illegitimacy); Craig v. Boren, 429 U.S. 190 (1976) (gender). Under intermediate scrutiny, legislative classifications are generally upheld if the classification is "substantially

9

related" to "important governmental objectives." Boren, 429 U.S. at 198 ("[C]lassifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives."). Intermediate scrutiny provides a more flexible approach than strict scrutiny and "does not leave 'ungoverned and ungovernable' an entire legislative area." Mary Jean Moltenbrey, Alternative Models of Equal Protection Analysis: Plyler v. Doe, 24 B.C. L. REV. 1363, 1378 (1983) (quoting Gerald  Gunther, The Supreme Court, 1971 Term — Forward; In Search of an Evolving Doctrine on a Changing Court:  A Model for a Newer Equal Protection, 86 HARV. L. REV. 1, 23 (1972)).  "The intermediate standard of review has thus enabled the Court to deal with classifications such as alienage, which may be appropriate for some legislative purposes but not for others." Id.  This is because, as the Supreme Court has noted, to require all classifications based on alienage to meet strict scrutiny would "obliterate all the distinctions between citizens and aliens, and thus depreciate the historic values of citizenship." Foley v. Connelie, 435 U.S. 291, 295 (1978) (quoting Nyquist v. Mauclet, 432 U.S. 1, 14 (1977) (Burger, C. J., dissenting)); Moltenbrey, supra, at 1378.

With this in mind, this Court now considers the standard appropriate for the evaluation of the challenged regulations promulgated by the Florida State Board of Education and the Florida Board of Governors.

A. Level of Scrutiny

By virtue of their classification, Plaintiffs are denied a benefit in the form of significantly lower tuition rates to the State's public post-secondary educational institutions.  This creates an additional obstacle for Plaintiffs to attain post-secondary education from one of the State's public institutions that is not faced by other residents.   Plaintiffs also face additional obstacles to the extent Plaintiffs are not afforded the preferential treatment residents receive throughout the admissions process at several of the State's public post-secondary educational institutions.

Public education is "not a 'right' granted to individuals by the Constitution. See Plyler, 457 U.S. at 221 (citing Rodriguez, 411 U.S. at 35). The Supreme Court, however, has noted the importance of education. In Plyler v. Doe, 457 U.S. 202 (1982), the Supreme Court held that Texas' denial of primary education to children who were undocumented for federal immigration purposes did not further a substantial state interest. Highlighting the importance of education, the Supreme Court observed that, "The 'American people have always regarded education and [the] acquisition of knowledge as matters of supreme importance.'" Id. at 221 (quoting Meyer v. Nebraska, 262 U.S. 390, 400 (1923)). "In addition, education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all [and] has a fundamental role in maintaining the fabric of our society." Id.

Though Plyler addressed a state's denial of *primary* education to individuals based on immigration status,[6] the importance of post-secondary education cannot be overlooked. In the thirty years that have elapsed since the Supreme Court decided Plyler, the needs of the labor force have changed dramatically and the importance of post-secondary education has increased significantly. Higher education is a prerequisite to pursue careers in science, medicine, engineering, and law. Those with post-secondary education attain higher earnings and suffer lower unemployment rates. According to the United States Department of Labor's Bureau of Labor Statistics, in 2011 the unemployment rate among persons age twenty-five or older with a bachelor's degree was 4.9% compared to 9.4% for those with only a high-school diploma. The same study found that those with a bachelor's degree had median weekly earnings of $1,053 compared to $638 for those with only a high-school diploma. See UNITED STATES DEPARTMENT OF LABOR BUREAU OF LABOR STATISTICS, EDUCATION PAYS (Mar. 23, 2012),

---

[6] Plyler v. Doe is also distinguishable because the plaintiffs in Plyler were undocumented for federal immigration purposes. Here, the Plaintiffs are U.S. citizens by virtue of birthright. See supra note 2.

http://www.bls.gov/emp/ep_chart_001.htm. A separate study found that the gap in earnings between those with college degrees and those without college degrees is continually widening. "In 2008, median earnings for women ages 25 to 34 with a bachelor's degree or higher were 79% higher than median earnings for women with a high school diploma. The earnings premium for men was 74%. These earnings differentials were 60% and 54%, respectively, a decade earlier." SANDY BAUM, JENNIFER MA & KATHLEEN PAYEA, COLLEGE BD. ADVOC. & POL'Y CTR., EDUCATION PAYS 2010: THE BENEFITS OF HIGHER EDUCATION FOR INDIVIDUALS AND SOCIETY 4 (2010); see also DAVID AUTOR, CTR. FOR AM. PROGRESS, THE POLARIZATION OF JOB OPPORTUNITIES IN THE U.S. LABOR MARKET: IMPLICATIONS FOR EMPLOYMENT AND EARNINGS 5 (2010) ("After three decades of sustained increases, the return to skills as typically measured by the earnings ratio of college graduates relative to high school graduates is at a historic high. In 1963, the hourly wage of the typical college graduate was approximately 1.5 times the hourly wage of the typical high school graduate. By 2009, this ratio stood at 1.95. The entirety of this 45 percentage point rise occurred after 1980.").

Therefore the State's regulations present "obstacles to advancement on the basis of individual merit." Plyler, 457 U.S. at 222. This outcome does not alone warrant heightened scrutiny, as residency requirements for access to in-state tuition benefits have long been held constitutional so long as they do not unreasonably burden other rights. See Vlandis v. Kline, 412 U.S. 441, 453–54 (1973) ("The State can establish such reasonable criteria for in-state status as to make virtually certain that students who are not, in fact, bona fide residents of the State, but who have come there solely for educational purposes, cannot take advantage of the in-state rates."); see also Martinez v. Bynum, 461 U.S. 321, 326–29 (1983). The State regulations do, however, distribute different benefits and create different obstacles between similarly situated individuals. Dependent U.S. citizen students who have lived in Florida for their entire life,

12

graduated from a Florida public high-school, and whose parents have "lived in the state for the preceding year," FLA. STAT. § 1009.21(1)(d), *and are U.S. citizens*, receive tuition benefits that significantly lower the cost-of-attendance to the State's public post-secondary educational institutions as well as preferential treatment in admissions.  Conversely, dependent U.S. citizen students who have lived in Florida for their entire life, graduated from a Florida public high-school, and whose parents have "lived in the state for the preceding year" *but are undocumented for federal immigration purposes* do not receive tuition benefits or preferential treatment during admissions.  Thus, the State regulations deny a benefit and create unique obstacles to attain public post-secondary public education for U.S. citizen children who would otherwise qualify for in-state tuition but for their parents' undocumented immigration status.

The Supreme Court has applied a form of heightened scrutiny when evaluating alleged violations of the Equal Protection Clause that arise from a state's denial of a benefit to a child or creation of an additional obstacle to a child solely by virtue of the parent's unlawful or immoral behavior.  In Clark v. Jeter, 486 U.S. 456 (1988) the Supreme Court used heightened scrutiny to evaluate a Pennsylvania statute that created obstacles to attaining parental support based on a child's illegitimacy.  Id. at 461; see also Plyler, 457 U.S. at 220; Mills v. Habluetzel, 456 U.S. 91, 98–99 (1982).  This reflects a fundamental principle of American jurisprudence: "imposing disabilities on the . . . child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing.  Obviously, no child is responsible for his birth and penalizing the  . . . child is an ineffectual—as well as unjust—way of deterring the parent." Plyler, 457 U.S. at 220 (quoting Weber v. Aetna Cas. & Surety Co., 406 U.S. 164, 175 (1972) (footnote omitted)).  Here, the State regulations deny a benefit to Plaintiffs and impinge Plaintiffs' ability to attain post-secondary education at the State's public institutions solely by virtue of their parents' undocumented status, and in a very real way the regulations

punish the citizen children for the acts of their parents.  Thus the State regulations' classification

is subject to heightened scrutiny and will not run afoul of the Equal Protection Clause so long as

it is "substantially related" to "important governmental objectives."

Defendants argue that they are merely complying with federal law and therefore

heightened scrutiny is unwarranted.  The Personal Responsibility and Work Opportunity

Reconciliation Act of 1996 ("PRWORA"), 8 U.S.C. §§ 1601, *et seq.*, provides that

> Notwithstanding any other provisions of law, an *alien* who is not lawfully present
> in the United States shall not be eligible on the basis of residence within a State
> (or a political subdivision) for any postsecondary education benefit unless a
> citizen or national of the United States is eligible for such a benefit (in no less an
> amount, duration, and scope) without regard to whether the citizen or national is
> such a resident.

8 U.S.C. § 1623 (emphasis added).  Defendants claim that because the State does not extend

tuition benefits to all U.S. citizens the regulations are compliant with federal law.  Defendants

further assert that because PRWORA authorizes a state to "require an applicant for State and

local public benefits . . . to provide proof of eligibility," id. § 1625, that PRWORA explicitly

authorizes the State to ask for proof of eligibility regarding the dependent applicants' parents.

Defs.' Mot. for Summ. J., at 11.

Defendants fundamentally misconstrue PRWORA and in doing so purport to classify

Plaintiffs—all of whom are U.S. citizens by virtue of birthright—by their parents' alienage.

Under the plain language of PRWORA, "[t]he term 'alien' means any person not a citizen or

national of the United States."  8 U.S.C. §1101(a)(3).  As Plaintiffs are not "aliens," PRWORA

cannot serve as a basis to restrict public benefits to them.  This is further bolstered by the fact

that public post-secondary education and lower tuition rates for in-state residents are properly

viewed as attaching to the student and not to the household.  It is the Plaintiffs who, upon

graduating from a post-secondary educational institution, receive their names on diplomas, and it

is Plaintiffs—not Plaintiffs' parents, cousins, or siblings—who are entitled to the benefits conferred by such a degree. See OP. COLO. ATT'Y GEN. NO. 07-03, 2007 Colo. AG LEXIS 3 (2007) (analyzing PRWORA and concluding that "[c]urrent state and federal law permit the state to grant in-state tuition status to students who are U.S. citizens but whose parents or guardians are undocumented aliens, as long as the student can properly establish his or her lawful presence in the United States and the other statutory requirements for establishing eligibility for in-state tuition are met. Because *it is the student, rather than the parents, who is the legal beneficiary of in-state tuition status*, the fact that the parents may be in the country illegally is not a bar to the student's receipt of that benefit." (emphasis added)).    As Plaintiff's note, post-secondary education tuition is "the responsibility and obligation of each student, not his or her parents, even if the student is a dependent when that tuition obligation is incurred." Pl.'s Resp., at 4. "[T]he University of Florida has expressed in no uncertain terms that students are responsible for tuition payment, late fees, and returned check charges, and has warned that it will maintain a 'financial hold' on the records of students who have delinquent fees and charges."    Id.; see also REGULATIONS OF THE UNIVERSITY OF FLORIDA ch. 6C1-3.035 (2012), available at, http://regulations.ufl.edu/chapter3/30375.pdf ("A student is liable for Tuition Costs associated with all courses for which the student is registered at the end of the drop/add period.").

Therefore, Defendants by their own admission classify Plaintiffs by virtue of their parents' undocumented status. The Supreme Court has recognized that alienage classifications are not subject to strict scrutiny because to do so would "obliterate all the distinctions between citizens and aliens, and thus depreciate the historic values of citizenship." Foley, 435 U.S. at 295 (quoting Nyquist, 432 U.S. at 14 (Burger, C. J., dissenting)).    Here, however, Defendants classify U.S. citizens as aliens, and in doing so, create a second-tier of U.S. citizenship that depreciates the historic values of *Plaintiffs'* citizenship by affording Plaintiffs some of the benefits that other

similarly situated U.S. citizens enjoy but not all of the benefits. Such a classification provides an independent basis for the application of heightened scrutiny. See Lewis v. Thompson, 252 F.3d 567 (2d Cir. 2001) (holding that the "highly deferential standard appropriate in matters of immigration" was not applicable because the claim was asserted on behalf of a citizen who was denied automatic eligibility for Medicaid benefits due to his parent's alienage and therefore heightened scrutiny was appropriate).

### B. Application

Defendants' sole justification for the classification propounded by the State regulations concerns the State's limited financial means and the quality of public post-secondary education. According to Defendants, "If Florida were required to extend the benefit of in-state tuition rates to all United States citizens regardless of their State of residency, the annual impact would be approximately $200,000,000 in reduced tuition revenue. This result would have a significant negative impact on Florida's public universities and colleges." Defs' Mot. for Summ. J., at 3–4.[7] Defendants' claim is premised on Defendants' flawed interpretation of PRWORA—that by offering in-state tuition rates to the U.S. citizen children of undocumented immigrants the State would be forced to offer in-state tuition rates to all U.S. citizens. This is simply incorrect. As noted, PRWORA is inapplicable as Plaintiffs are not "aliens" but rather U.S. citizens and the benefit of in-state tuition rates and public post-secondary education accrues to the student and not the household. See supra Part V.A. Affording U.S. citizen children of undocumented immigrants—who would otherwise meet Florida's residency requirement but for the parents' undocumented immigration status—the same privileges and opportunities as U.S. citizen

---

[7] Defendants misconstrue the class of persons seeking reduced tuition and other benefits based on Florida residency and not *regardless* of Florida residency.

children of U.S. citizens who meet Florida's residency requirement would not prevent the State from continuing to distinguish between in-state residents and out-of-state non-residents.[8]

Although not argued by the State, this Court has independently undertaken consideration of other bases upon which to uphold the challenged regulations. Even turning to the traditional state interests offered in support of residency requirements for access to in-state tuition rates, however, the relationship between Plaintiffs' residency, their parents' immigration status, and these State interests is far too tenuous to justify the State's classification of Plaintiffs and withstand heightened scrutiny. See Boren, 429 U.S. at 204 ("[T]he relationship between gender and traffic safety becomes far too tenuous to satisfy Reed's requirement that the gender-based difference be substantially related to achievement of the statutory objective."). As Plaintiffs emphasize, "Florida does not have a state income tax through which public education is funded [therefore] it cannot be argued that a reduced resident tuition rate is intended to return taxed income." Pl.'s Sur-Reply, at 4 n.1 (ECF No. 70). "Plaintiffs and their parents make the same contributions through transactional taxes within the state of Florida as those classified as in-state residents." Id. Accordingly, the State's classification bears no relationship to any State interest in distributing funds to its own citizens[9] from whom a significant portion of the funds originate.

The classification also bears no relationship to any State interest in ensuring that in-state tuition benefits are provided only to those who evince an intent to remain in Florida post-graduation and, by virtue of their public post-secondary education, will contribute to the State's

---

[8]   Indeed, nothing herein should be construed so as to preclude the State of Florida from requiring proof of Florida residency from a dependent U.S. citizen student and the student's parents in order to classify the student as a resident or non-resident for tuition and other related purposes, only that a U.S. citizen student who resides in, and whose parent resides in Florida cannot be denied in-state residency based on a parent's inability to provide proof of his or her federal immigration status.

[9]   This is similar to the argument advanced by the State of Minnesota in Starns v. Malkerson, 326 F. Supp. 234, 240 (D. Minn. 1970), aff'd, 401 U.S. 985 (1971).

economy. <u>See</u> <u>Starns v. Malkerson</u>, 326 F. Supp. 234, 241 (D. Minn. 1970), <u>aff'd</u>, 401 U.S. 985 (1971) ("[Minnesota] has a valid interest in providing tuition-free education to those who have demonstrated by a year's residence a bona fide intention of remaining here and who, by reason of that education, will be prepared to make a greater contribution to the state's economy and future."). To justify such an interest based on the classification at issue would necessitate finding that U.S. citizen children of undocumented immigrants—who would otherwise meet Florida's residency requirement but for their status as dependents and their parents' undocumented immigration status—are less likely to remain in the State and contribute to the State economy than U.S. citizen children of U.S. citizens who meet Florida's residency requirement. There is simply no support for such a finding.

## VI. CONCLUSION

The State's definition of "legal resident" is facially neutral regarding federal immigration status. <u>See</u> FLA. STAT. § 1009.21(1)(d). However, as applied, Defendants' additional criteria[10] for determining residency for public post-secondary education purposes classifies Plaintiffs in such a way as to deny Plaintiffs the same benefits and important opportunities as similarly situated individuals by virtue of their parents' undocumented immigration status. The relationship between Plaintiffs' residency, their parents' immigration status, and the State's interest in providing quality public post-secondary education is far too tenuous to justify the State's regulations and withstand heightened scrutiny. Accordingly, Defendants' regulations violate the Equal Protection Clause to the Fourteenth Amendment of the United States Constitution. In light of this Court's ruling with respect to Count I of Plaintiffs' Amended Complaint, this Court does not reach Count II of Plaintiffs' Amended Complaint made pursuant to the Supremacy Clause of the United States Constitution.

---

[10] <u>See</u> FLA. ADMIN. CODE r. 72-1.001(5)(a)3; FLA. ADMIN. CODE r. 6A-10.044(4).

Accordingly, it is

ORDERED AND ADJUDGED that Plaintiffs' Motion for Summary Judgment (ECF No. 70) is GRANTED IN PART AND DENIED IN PART.  This Court awards summary judgment in favor of Plaintiffs with respect to Count I of Plaintiffs' Amended Complaint (ECF No. 29). Count II of Plaintiffs' Amended Complaint is DENIED AS MOOT.  Final judgment will be entered by separate order.  It is further

ORDERED AND ADJUDGED that Defendants' Motion for Summary Judgment (ECF No. 81) is DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this 31st day of August, 2012.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:    All counsel of record

19